Good afternoon, everyone. Very happy to open this session in Pittsburgh. We'll call the first case, Nova Chemicals v. Sekisui. Thank you, Your Honor. May it please the Court, I would like to reserve five minutes. That's fine. My name is Walter Flam, the firm is Flam, Boroff & Pessin, 794 Penland Pike in Bluebell, Pennsylvania. We represent Sekisui Plastics Company Limited. The case we have contended all along is a very simple case, and I'm going to make the essence of our argument as a very simple argument. The case is not a patent case, it's a case of the licensing of technology and trade secrets. At the end of the day, and just by way of background, the product involved here is what we would commonly look at as Styrofoam, but the new and improved product is what's called Pyosolon on the Japanese side, and Arcel on the, from the Nova side. It's commonly used as dunnage in electronics that you buy. I see that you're sidestepping the issue of patent. You did have a patent for this technology. You did have a patent for the technology. There were patents for the technology. I don't believe I'm sidestepping it. I don't believe this is a patent case. I'm prepared to address the issue that the court requested, but this is not a patent case. It is a licensing of know-how and technology. It also involves patents, but the patents themselves are not even referenced by number. Do you have any proprietary rights or legal rights to the technology? Yes. What are those rights? The rights are that they are trade secrets. Well, how can they be trade secrets if you shared them with your folks on the other side and then time limited the confidentiality so that, as I understand it, I think they're arguing this, any confidentiality obligation they had with respect to the technology has expired by the terms of the agreement itself. Isn't that right? I think that if we're reading Article IV, we could get in another argument, but I think the facts speak for themselves, Your Honor. Well, answer my question if you can. If you can't, that's fine. But does the agreement not say that any confidentiality that folks from ARCWINOVA had with respect to the technology that Sec. Seward came up with is an obligation that expired by the terms of the agreement? It says that the confidentiality provisions of Article IV expired at the conclusion of the agreement. Well, you're not contending, are you, that Article IV is somehow different, separate from governing something other than the substance of the rights that are at issue here, are you? I'm saying, Your Honor, that the license involves the license of know-how and other things. It provides for an agreement of Sec. Seward personnel to train and educate NOVA personnel, and it includes something more than patents. And the facts speak for themselves that there are only two people that can do this, that can manufacture this today. We're talking around, though. I'm trying to get you to address a key point which you raised, Mr. Brown, in response to Judge Fuente saying, do you have underlying rights, intellectual property rights? You said, yes, we have trade secrets. What I'm trying to get you to respond to is that assertion that I understand the other side would be making, that you don't have trade secrets anymore. You shared the technology and know-how with them, and you did it in a way that, by the terms of the agreement itself, releases them from any obligation to keep it secret. Now, I'm just trying to get you to respond to that argument. Is that an accurate assertion or not, according to the terms of the agreement itself? The agreement, Your Honor, I'm not trying to sidestep the issue, believe me. The agreement says that those confidentiality arrangements under Article IV end at the end of the agreement. Then how could there possibly be a trade secret underlying this agreement at this point in time? Because, Your Honor, the parties agreed to license to a permanent license. Why would they agree to a permanent license if there was not something to license? So your argument is it's true we don't have a trade secret anymore because of Article IV, but they're still bound because there's something there, there must be something there, or they wouldn't agree to it. Have I got you? I think that's one way of putting it, yes. Okay. But what that something is that's underlying the agreement, it's clear it's not a patent at this point, and it's clear it's not a trade secret at this point, but it must be something. It is something that the parties felt was important enough that NOVA wanted a permanent license to sell. Could you refine what that something is? If it's not a patent, it's not a trade secret? Your Honor, it could have been the advantage that was given to, and I'm sorry if I appear to be elusive here because this wasn't really an issue that was litigated factually below, so there's little record on it. But the basis could have been for the license, the concept of granting a permanent license subject to a restriction, the basis could have been that Secchi Sui trained the ARCO personnel how to make this product and gave them a leg up in the market, the ability to do it when no one else could. And for that reason, my point is that there are independent reasons for supporting the restriction beyond the secrecy. It doesn't stand... All of this hinges on our finding that there was a separate agreement that was perpetual. Not a separate agreement that was perpetual, Your Honor. The finding, what I think is plainly evident from Article 11, Section 2, is that there was a permanent license. Now, I don't know whether a permanent license means that that's perpetual. Perhaps it does. But there was, after the agreement says in Article 11, that after the payment of all of the sums called for under the agreement, and it refers to Article 6, which calls for payments of lump sums running royalties for 10 years, for the period of the agreement. Article 11 says after all of these things are paid, NOVA has a fully paid up license. And you characterize that in your briefing as a separate agreement, don't you? In your briefing, you say Article 11 has two parts to it. The first sentence refers to rights and obligations that come from articles 5.2 and 5.3, and the second sentence of Article 11 is a whole other animal. It's a fully paid up license, and I think that's what Judge Valantes was getting at. I mean, for us to buy your argument, we would have to agree with you that Article 11 has, in essence, two pieces. One, reaching back to 5.2 and 5.3, and the second, coming from the second sentence, a fully paid up license which stands on its own and is in perpetuity. Isn't that right? I think that you can view it as two licenses, yes. I'm not sure the parties viewed it that way when they did it. We've over-intellectualized this document. With all respect, the lawyers have made it much more confusing than it is. The agreement simply was that we're going to give you certain things. The parties agreed that a license was necessary for NOVA to do what it wanted to do, to make and sell. The parties agreed that a license was necessary for that. They agreed in Article 11 that at the conclusion of the agreement, NOVA would have a fully paid up license to sell anywhere in the world subject to restriction. Wasn't there testimony in this case by Sekisui's own manager or the person who drafted the first agreement that the parties never anticipated, a permanent ban on the part of NOVA to trade in Asia? I think you may be referring to Mr. Saito's testimony that didn't use the word forever. Yes. Well, let's see. There was testimony. One of the Sekisui managers or person instrumental in the drafting of the first agreement testified that there was no discussion about how long the proposed restriction on ARCO's ability to sell products would last. No discussion at all. Doesn't that argue against your position that there was a permanent ban? You want to put this in common terms. Who in their right mind is going to agree to a permanent ban to sell products in a major sector of the world? I think NOVA did, and I think they did because this was the deal. The deal was Sekisui can manufacture this new product that is going to take the place of Styrofoam. Sekisui didn't want to give up Asia. Sekisui gave NOVA the rest of the world in exchange for NOVA's agreement to give up Asia. Sekisui put the language. To give it up forever is your argument, and your forever argument is pinned on the words fully paid up, right? To give it up for the same time that their license existed. You can't have both. You either have a fully paid up license to sell for however long that lasts, subject to a restriction, or you don't. Well, that's why the district court disagreed with you, right? I mean, you posed this as a, if you don't have the right to do it, then by definition and by the terms of this agreement, you're forbidden to do it. I understand your argument, and as you reiterated here today, this thing's being over-intellectualized when it's just as simple as an on-off switch. If it's on, it's on. If it's off, it's off. It's binary. So saying that you're not permitted to sell under the terms of the license in Asia means you can't do it ever. I think I've got your argument, right? Have I got your argument? My argument is if you need a license to sell it, if you agree that you need a license to sell it, the license has the terms that the license has, and the license terms are you can sell it subject to not being able to sell it in Asia. However long that license lasts, the restriction lasts. You can't say I have a license to sell the stuff that didn't expire with the agreement, but there's a restriction that did. They can also manufacture it, can't they? They can manufacture it, yes. But you say they can manufacture and sell it anywhere, but they can't sell it in Asia. They can manufacture it in the U.S. and Canada, and they can sell it anywhere in the world but Asia. Now the district court looked at your argument and said, if I understood it correctly, that it did not take account of, and I am paraphrasing loosely, it did not take account of an understanding of the license as pinned on intellectual property rights. That is, it was designed and set up in a way that meant any restrictions or limitations in the license lasted only as long as the rights claimed to be given lasted. And since you don't have rights to give anymore, the restrictions can't extend either. That's, if I understand correctly, what the district court said. What's your response to the district court's assertion that it's not your license agreement that can forbid these people forever? The license can only grant and then withhold certain things, and once the underlying stuff on which the license is based is gone, by definition they can do whatever they want wherever they want. What's the response to that? That you're writing off the permanent license, the fully paid-up license in order to go. What's the point of having a fully paid-up license at the end of the agreement if there's nothing to license? There's no point. So to do that, you're saying that this entire provision of the contract is meaningless. Well, doesn't that ignore the possibility, and indeed isn't it relatively common for licenses to include sell-off provisions for something that was made before the expiration of certain rights and then allows them to sell off after the license period ends? I don't know whether that's correct as a factual matter, but it's certainly not in this record. There was a license the parties negotiated for a fully paid-up license that you can't rationalize it any way other than that fully paid-up license started when the agreement was done, and the fully paid-up license was to sell anywhere in the world except to these countries. Whether that's a proscription or a description doesn't make any difference because, as Your Honor points out, it's a binary notion. I was reflecting what I understood your argument to be, and I think I understood it correctly, that it's binary, right? Yeah, that's my argument. You did have patents, properly registered patents, for the Pyoslin product? Yes. Those patents have expired? Yes. Can anyone then manufacture Pyoslin? Anyone that... Anyone that takes the trouble of going through the patents and figuring out the technology? No. Why not? Because they don't have the trade secrets. They don't know the processes. They don't have the equipment. There was other... Well, NOVA knows the secrets. Can't NOVA then share that with another manufacturer? I suppose they wouldn't. Licenses without confidentiality? Yes. And if they did, could that other party sell in Asia? We would be arguing that they could not. They would be doing it indirectly. Mr. Flan, thank you very much. Thank you very much. Mr. McIntyre? Thank you, Your Honor. May it please the Court, I'm John McIntyre, Counsel for the Appley NOVA Chemicals, Incorporated. Let me start by following up on some of the Court's questions because I think I can shed some light on the questions that you asked about. Certainly, the consideration that was provided by Sekisui in the license agreement was to grant restrictive patent rights and trade secrets from Sekisui to ARCO. As this Court has recognized, and the record is absolutely clear, all of those patents have expired. With respect to the trade secrets, Article 4 is very clear. Article 4 said that, in paragraph 4.3, that the use of the trade secrets by the party who received them was restricted only to implement the purposes of the license agreement. I don't think you're getting a disagreement from the other side on that. What I do think you're getting a disagreement from them on is the assertion that no, there's nothing that continues to bind your client. So I'd like you to respond, if you would, to Mr. Flan's argument that certainly ARCO and NOVA knew that there was something binding and obligating NOVA going forward, or they would not have transferred the license after the expiration date. Certainly, Your Honor. What would be the purpose of doing that if there was nothing there? And indeed, what would be the meaning? And more importantly, does the position that your client is taking here render the fully paid license language of Article 11 meaningless, just surpluses? Certainly, Your Honor. Let me address both of those. First of all, as we point out in our brief, the question about the assignment and its legal meaning wasn't raised below. If it had been, we would have pointed out that Article 4, as we have discussed right here, granted ARCO and subsequently NOVA free use of the trade secrets. Once the patents had expired, anybody in the world was free to use the technology. But we were granted a right under the license agreement to these trade secrets, and we are free to use them now as we please. Therefore, there was a property right that vested in ARCO and now NOVA, and that was the purpose for the assignment. The other point that I would make is as the record. Are you then conceiving that these are trade secrets, that the thing you took, even though they gave it to you and you don't have any confidentiality obligation, that those could still be trade secrets under the law? Whether they are or not, Your Honor, I think that they are, frankly. And how is that in your client's interest to take that position, and how could it be that as a matter of law, since you're under no restriction and could deliver that information to anybody you wanted? It's in my client's interest because we are maintaining them as trade secrets ourselves. We don't want to disclose them necessarily to the world. Therefore, both SECISUI has a proprietary interest in those trade secrets, as do we. But if you did disclose them to a third party, would you not be in violation then of the agreement? No, Your Honor, we wouldn't be in violation. In fact, Article 4 specifies that 10 years after the exercise of the option, all obligations with respect to the secrecy under the trade secrets shall expire. And they did expire with the rest of the license agreement. So though it may be against your economic interest, you're free to share the technology and whatever you learn from SECISUI with any other third party in the world. Exactly, Your Honor. So you can keep it secret if you choose, but you don't have to. In other words, I guess what I hear you saying is now it's your trade secret. It's not theirs as long as you can share it with anybody and they have no control over the secrecy. It can't be theirs? Actually, Your Honor, they have the same interest. They are free. There's nothing binding them to maintain the secrecy of these trade secrets. If they wanted to disclose them to DuPont, they would be free to. Sure. And I'm not trying to see how many angels dance on the head of a pin. I'm trying to understand something here. So your assertion, though, is that as far as your client is concerned, you can keep it close and secret if you want, or you can share it with whoever you want. And that's your position, right? Absolutely. So as a matter of fact and law, doesn't that take the control of the secrecy away from sex suing? I think as a matter of law it does. Okay. And likewise, since they could share with anybody they want, you don't have control of the secrecy? Absolutely. Okay. Did the district court address the issue of whether there were trade secrets that were part of an agreement? It did, Your Honor. The district court's opinion specifically states that we were free to use the trade secrets as we wished after the expiration of the license agreement. And that was the expiration of the Article V 10-year period? Correct. Is there any difference between that 10-year period and the 10-year period described in Article XI? It turns out, Your Honor, that it's the same. The way that Article IV was written, it contained provisions that would have maintained the secrecy obligations beyond the termination only if the termination had occurred prematurely. So if for some reason ARCO were to terminate the agreement, there was a secrecy obligation that would have extended beyond that termination. But because the agreement ran its full course, those secrecy obligations terminated with the rest of the license agreement. It ran its full course when? February 20, 1995. So what I'm not sure I understand yet, Mr. McIntyre, what's the position you have with respect to Article XI? Are you saying that they did license you valuable technology and there continues to be an intellectual property right underlying that license and it's fully paid up and you're operating under that license? No, we're not saying that, Your Honor. Because that would be the other side's position. It would. Gotcha. So then what are you saying with respect to Article XI? How do you read fully paid up? Certainly. Let me address that. First of all, I think in order to define Article XI, what it means, you have to look at 5.4 and what it accomplished. Article 5.4 dealt with the right to sell in the Asian countries. But it wasn't a contractual prohibition because no contractual prohibition was necessary. Secosui had existing U.S. patent rights. And if we or ARCO had sold in the Asian countries, they could have sued for infringement here in the United States. So clearly Article 5.4 granted us an affirmative right to use, to manufacture in the United States and Canada and to sell in every country of the world except 12. And the reason that they did that was you couldn't define that. You're saying that was solely because of patent rights? Yes. Okay. Then point me to where in the document that exists. What in this agreement says, hey, this license with respect to limitations on territory, this is all about the patents, not trade secrets? First of all, Your Honor, I think that you have to look at – Let's just be blunt. Sure. It's not in there, is it? There's nothing in this agreement that says anything like that, is there? No, but I think you can tell from the context in which Paragraph 5.4 is placed that that's the case. For example, let me direct the Court's attention to Paragraph 5.1. Paragraph 5.1 also granted ARCO a right to sell products prior to the time that the option was exercised. Paragraph 5.1 says you shall have the right to sell in the United States and Canada. It doesn't say you can't sell in the Asian countries. It doesn't say you can't sell in South America because it didn't have to. They were already prohibited. The only rights that ARCO had sprang from this license agreement. Prior to that time, they were barred by the patent laws. But 5.4 clearly bars you from selling in the 12 Asian countries, doesn't it? It does not, Your Honor. What it does is it grants an affirmative right to sell everywhere else. It would have been almost impossible for the parties to say, you're granted an affirmative right in the following 180 countries. So what they had to do was to say, we're going to say you have an affirmative right to sell everywhere except here. And that's the language they used, except. It doesn't create a bar. When you say that doesn't create a bar, in order for that not to create a bar, one has to assume the underlying rights theory that the District Court did. If I understood the District Court's position and ruling, it was the rights don't spring from this license alone. This is a license that has to lay on a foundation of independent rights, intellectual property rights. Correct. And prohibitions. And the statements in the license about where you can sell and where you can't sell, because I guess I'd have to agree with your opponent here, that if it says you can sell everywhere but here, that's another way of saying as long as we're under this license, you don't have a right to sell. I disagree, Your Honor. I disagree. What is it, other than the intellectual property right itself, that could possibly exist as a third way between you can sell here except there and you can't sell in Asia? What's the third way? They say it's binary. You're saying it's not. What's the non-binary answer? The third way would have been ARCO agrees not to sell in the following Asian countries but shall have a right to sell in all other countries of the world. That's the third way. That shows an affirmative agreement on the part of ARCO not to sell in those countries, whereas the language here simply talks about the right to sell everywhere except. 5.4 even mentions the countries that you cannot sell the product. Exactly, Your Honor. It doesn't mention where you can't sell it, Your Honor. Tell me where this is wrong. This is 5.4. ACC, your predecessor, shall have the right to sell products and other resinous materials in all countries of the world except in the following countries. Correct. Both countries are named. Now, does that not mean you cannot sell? It does not. Basically Sekisui's Backyard? No, Your Honor. It does not. And the reason is. So I've misread that? No, Your Honor. The point is that you can't read it in a vacuum. You have to understand that this is a license agreement that Sekisui has the right to prohibit sales anywhere. So I have to go somewhere else in some other provision of this contract in order to fully understand 5.4? No, Your Honor. You have to look at the context in which it was entered into. This is a license agreement. What happened to plain reading? I'm reading the words of 5.4, and it says you cannot sell there. It doesn't say that, Your Honor. It says you can sell everywhere except. And your reading of the word except means it doesn't really mean except. No, Your Honor. It means you can sell everywhere except there, and except in this instance means you could sell there, but not really. I mean, you've taken us down a rabbit hole it feels like. You keep saying look at the context, look at the context, but I've got to say I don't know what context you can point me to that doesn't end up with the words except, meaning we really are letting you sell here and not there. Your Honor, let me direct you back to 5.1. 5.1 says you can sell in the United States and Canada. It sure does. Would the court agree that under the patents we were prohibited from selling anywhere else? Well, since this doesn't appear to me to be a license limited to patents, I'm not sure what that question goes to, sir. Your Honor, at a minimum. To where in the agreement it says the technology we're talking about here and the limits we're talking about here are the limits associated with the patent rights and not the trade secret rights, then we would be having a different discussion. But I've looked at this license. I can't find it. You haven't pointed me to it. So I'm not sure where you get from this document or frankly from any of the evidence you've proffered in the district court and it's in the record before us, that these limitations were tied to the patent rights and were not also tied to the rights which you yourself have described as trade secrets. Yes. Your Honor, I agree with you that you could look at under either scenario. If you look at paragraph 5.1, you would agree with me, would you not, that ARCO had a right to sell in the United States and Canada but did not have a right anywhere else. There were no other countries that were mentioned. Are you asking me a question? I'm saying that the point is that you have to understand this in the context of intellectual property rights. It can't be divorced from that. Even if the court were to conclude that ARCO agreed to a contractual prohibition on sales in the Asian countries, you then have to get to that it's a perpetual prohibition that extends forever. That's a good point. But going back to this point of the prohibition of selling in Asia, was there any point in naming a country specifically that according to 5.4 you cannot sell the price line? Absolutely, Your Honor, because what they were saying is we're granting you an affirmative right to sell in all countries of the world except here. So the reason that you have to name those countries is to make clear to the parties where you were not granted an affirmative right. Doesn't it make sense that this is simply Sekisui's backyard? They were also selling the product and didn't want you competing with them. That's fine, Your Honor, but the Supreme Court in Brulotte has held that you can't bar the use of patented technology beyond the term of the legal monopoly granted by the patents. You're back to patent technology. Well, certainly, Your Honor. I mean the Supreme Court has made clear in Brulotte that it's simply void. You can't agree to impose any geographic restrictions beyond the term of the patent. You're raising the Sherman Act issue. The Sherman Act, but I think more directly Brulotte, Your Honor. Well, how does Brulotte?  I mean if they've got trade secret technology and they want to limit you geographically with that, they can do that until the cows come home, can't they? But, Your Honor, this goes back to your very first point, which is that all the trade secret restrictions have expired. So if the patents have expired and the trade secrets have expired, we don't need a license. Then explain to me what you have and are operating under. Now, it really does go to the first point. They say there must be something that the other side believes they're licensed under. They claim a fully paid-up license. Article 11 talks about a fully paid-up license. They assert that there's know-how that they're keeping in confidence. They're operating under a license, and as long as they're operating under that license, we're entitled to enforce the restrictions associated with that license. So if you're taking the position that, wait, there really is no trade secret, tell me what it is that Article 11 fully paid-up license is talking about. What Article 11 fully paid-up license is talking about, as we point out in our briefs, is that ARCA wanted to make very clear that as long as they had paid all of their running royalties during the term of the agreement that they had a fully paid-up license. They couldn't be sued for infringement if there were some technical violation of the agreement that existed. In other words, NOVA was done. You made your lump sum payment. You paid all the royalties. You were finished. Exactly. What did you think you were buying with that additional time period? It makes sense. Here's what makes sense to me, and here's what doesn't. We're sort of out of time, but can I ask that? Sure. I can get my head around the notion that whether you call it a trade secret or a patent, there has to be some intellectual property right underlying the license for the thing to make sense. And I can also appreciate and understand the position that's been taken that, hey, we don't have an obligation to keep things secret. And so in that respect, they don't have any enforceable trade secret right against us. And therefore, there's nothing underlying this license anymore, and we can do whatever we want wherever we want because they're done. I can understand that assertion. What I'm having a little trouble with is, and what seems to be contradictory in your presentation here today, is how you deal with their argument that that would render the second sentence of Article 11 nugatory. It would make it just meaningless. There was something out there that they were willing to pay money for and take a license for, and maybe it's not a patent, maybe it's not a trade secret, but it's some kind of intellectual property, right? And they paid for it, and therefore, there's a restriction that still exists on them. And I'm still not understanding your position on that assertion. You paid for it. You seem to be even saying here, yeah, we've got a license of some sort, whereas I would have thought your position would be there is no license because there's no underlying intellectual property, right? Your Honor, I must not have been clear. I guess my point was that our position is that the second sentence of Article 11 relates to a fully paid-up license during the term of the agreement. Our position is not that we bought some license or that we needed a license beyond the term. And I think that our point would be, even if the Court were to conclude that Article 11 read differently, I think you could say it's unclear from the record if the patents were still in effect at the time that the license agreement expired. But even if you gave Sekesui the most generous interpretation possible and that the patents were in effect the day before the license agreement started in January of 1983, those patents would have expired in January of 2000. Therefore, there was no intellectual property right that existed after January of 2000 that we would have needed a license for. Does that mean that the license that you obtained under the option and paid for under, I think it's Article 6, lump sum payment and royalties has now been satisfied, so you now have a fully paid-up license? Is that your position? Your Honor, it's not our position. Our position is that Article 11 related to rights during the term of the agreement, that the fully paid-up license referred to the fact that if we were making our running royalties as they were coming due, that we had a fully paid-up license during the term and not post expiration. Mr. McIntyre, thank you very much. Thank you, Your Honors. Mr. Flynn. Thank you, Your Honor. I would just like to make two brief points. The first one is that we must remember to stay to the record here. The issue about patents, if you read the agreement, there's no patent numbers, there's no description of patents, and I don't think we can be making arguments about, as Mr. McIntyre does, about looking at this as an overlay over who had patent rights where because there's nothing in the record to that effect, and some of the facts that I've heard bandied about here are not correct. Are you saying that the technology here was not at some point or a part of it at least patented technology? It was, but this agreement is not based on a framework of patent technology. If you look at the agreement, what was licensed under Article I, most of them are the equipment and technology and not patent rights. Patent rights is number nine of the listed items. The rest of them are technical. But both things were in play, right? Patent rights were in play, trade secrets and know-how were in play. Both of them were being dealt with by this license. That's correct. Do you agree with your opponent that there were certain aspects of the patent rights that didn't expire until post-2000? Nobody knows when the patent rights expired. It's not in the record, Your Honor. There's nothing in the record about when the patent rights. The last point, this argument that the fully paid-up license is during the term of the agreement is, with all due respect to my opponent, preposterous. A fully paid-up license, it's plain English for goodness sake. A fully paid-up license is something that's fully paid up, and the agreement says that upon payment of a fully paid-up license under 6.1, which refers to the running royalties lump sum over ten years, that's how you get a fully paid-up license. Can you touch at some point on Mr. McIntyre's point that your interpretation of the agreement imposes a permanent perpetual bar on NOVA trading in Asia? It grants them a permanent perpetual license to sell everywhere in the world that they felt was of value. They don't have to pay anything for that license. They paid for it. It's already paid. They paid for it over ten years. They have a permanent paid-up license to sell everywhere in the world. If I were NOVA, I wouldn't have wanted to pay you, so I wouldn't have your license, and then I could use that technology to go ahead and sell the product in Asia. Your Honor, they would have never gotten the technology for the actually 16 years that they had it before the agreement expired. This license never ends, according to you, right? When Gabriel sounds his trumpet, there will still be a restriction on NOVA in selling in Asia, correct? NOVA would still have a right to sell everywhere in the world, Your Honor. Except in Asia, right? Right. But you can't look at only one side of this agreement. It's, you know, I'm going to buy your car for $1,000, but I'll give you the $1,000 and I don't get the car. We're not trying to look at it from one side. In fact, my question is specifically premised on your reading of this license, which is to say except is to say you cannot. That's correct. Right? And so under your reading of this license, they cannot ever, forever, sell anything into Asia that's covered by this license. Is that correct? That's correct, because their license lasts for that long. That's all I have to say, Your Honor. If you don't construe the Article 11 to impose exactly what Your Honor said, then the fully paid-up license is meaningless. There can be no meaning to it because there's no point to it. And if you have a fully paid-up license, then the terms are set forth right in the contract. You cannot sell anywhere but Asia. Mr. Flam, thank you very much. Thank you, Your Honor. We'll take this case under advisement. Thanks, counsel, for excellent presentations.